309 and 398, Cal National Bank-Goodall. Opposed by Roger C Boland versus Roger Foote. Have the lead by Thomas McCormick. Mr. Boland. May it please the court, counsel. My name is Roger Boland. Our office represents Mr. and Mrs. Barnard, who are the owners of some LaSalle and Putnam County farmland. Mr. Barnard is here today together with his farm manager, Douglas Ray. In mid-2004, Mr. Ray helped the plaintiffs prepare and execute a written five-year farm lease. Roger Foote is the tenant pursuant to the terms of that lease. The lease was scheduled to commence its operation on March 1 of 2006. As the court may be aware, farm leases tend to run from March 1 until March 1 of each year. The original lease contemplated cash rent to be paid in the sum of $96,000 annually. That turns out to be about $253 per tillable acre. Again, cash rent leases are generally structured based upon the tillable acre. In addition to the cash rent that was contemplated, the owner was charged with the obligation to pay for certain components of the fertilization program, and the tenant was charged with paying the other components of the fertilization program. Now, everything went well in year one of the lease. So from March 1 of 2006 to March 1 of 2007, the parties performed in accordance with the written provisions of the lease. In year two of the lease, however, the evidence showed that the tenant came to the landlord and indicated that he needed to pay more rent. Indeed, the evidence was that he offered to pay $24,000 additional rent, and the landlord said, oh, no, $20,000 would be fine. And so the parties negotiated in addition to the cash rent. Now, that translates into about $52 an acre, or roughly a 20% increase in the rent over year one. Now, by its terms, that amendment, which I've referred to in my briefs as the First Amendment, contemplated that change for one year and one year only. Now, what was going on, to put this in context, the agricultural economy between year two and three underwent some very volatile times. Commodity prices soared. Indeed, corn prices reached a record high in that period of time. But as with the income, the expense aspect of the ag economy also increased dramatically in that period of time. As a result of that economic volatility, the parties got together again and created what I refer to as the Second Amendment to the farm lease. What that Second Amendment did was increase the rent payable by the tenant even more by $36,992, which translates into 38% over the original rent. It also added what I call the subject language. And that's what brings us here today. Let me ask you a question before we get there, Mr. Boland. Was the tenant farmer under any obligation to go renegotiate anything? No. Well, I mean, it seems to me that the theory is, your case is, no good deed goes unpunished. He goes out and offers to pay him some more money because things went well his way. And so now you want to change the whole contract. No, I don't want to change the whole contract. I want the parties to live with what they did. Which brings us to the subject language. There were motives on both sides here. The tenant and the landlord had a long relationship. That was brought out at the time of trial. The tenant went to the landlord for a purpose. And the purpose was to secure the relationship he had with the landlord. I'm going to speculate now, but I think he was looking forward to a longer relationship. And so there was a motivation behind what he did. And I'm not saying that he should be punished for that. I'm just saying that when it came time to address the language that they incorporated in the Second Amendment, let us live with what they did. What's the purpose of a five-year lease? Well, I'm going to say job security on both sides. It's like the baseball player that signs an eight-year contract with his favorite baseball team. He wants the security of knowing where he is and what he's going to get paid. I would say that's what the parties, or why they did what they did in calendar 2004. Now, in any event, we come to it was in December of 2007. So we're in year two of the lease, looking forward to the inception of year three, which was going to start March 1, 2008. And the parties, as I say, they adjusted the rent up a little higher. But they added this language, and I'm quoting. Each year, the cash rental amount shall be adjusted to reflect current corn and soybean prices and yields. What did you say? The parties did that, or your client unilaterally did it? The parties signed. Both parties signed the Second Amendment, which includes this language. OK. March 1, 2008 rolls around, and the rent is paid, or payable, at the higher rate. That's at $36,992 over the original lease. And the parties perform in accordance with that. And then in September of 2008, so we're in the middle of year three, in September 2008, the parties met once again to implement that Second Amendment, to deal with making an adjustment prospectively. The record in this case shows that the parties reached an agreement as it relates to the amount of the rent and the allocation of the fertilization program. Indeed, the tenant testified at trial that he came up with the numbers. And when he left the meeting, he testified he thought he had a deal on an adjusted basis going forward. The landlord's farm manager testified and concurred. So there really isn't any factual dispute over what the upshot of the September 2008 meeting resulted in. They left thinking they had a deal going forward. The farm manager created a written lease to memorialize what the parties had done verbally. And when the written lease was presented to the tenant, he wouldn't sign it. And so that's where we have a parting of the ways between the parties. The agreement in year three, where they added the amendment, did they also agree that they were going to go to a year-to-year lease? That is not specifically mentioned that they would go to a year-to-year lease. The only thing, the language is each year, the rent would be adjusted, taking into account commodity prices and yields. So it doesn't say we'll do an entirely new lease. It says each year the rent will be adjusted, obviously an essential component to the contract. And the adaptation that was prepared by the farm manager and given to Mr. Foote to sign was a one-year lease. That is correct. Now, to amplify a little bit more on that, during the course of the testimony, Mr. Foote testified he never offered that what the farm manager presented him deviated in any way from the September 8 meeting. He simply refused to sign it. Did he say why? Excuse me? Did he give a reason? No. We can, again, speculate that he reconsidered his mathematical position. That would be the only explanation that I could come up with. And so the question became, where does that leave the parties? What is the effect, if any, of the language, what I call the subject language in the Second Amendment, to the lease? Now, what's interesting in our case, one of the issues this court is going to have to wrestle with is what the standard of review is. I practiced just over 30 years, and I've had a number of cases in this court. And there's never been a serious dispute, in my experience, over what the standard of review is. This case, however, presents a difference. We suggest to this court that the standard of review is a de novo standard. Why? Well, at the end of the plaintiff's case in chief, Judge Gowdy, sitting without a jury, determined that the landowner, the plaintiff, had not made out a prime facie case and granted the defendant's motion, which had been orally presented under 2-1110 of the Code of Civil Procedure. It's my reading of that statute, as well as the case law, that when a trial court determines that a plaintiff fails to make out a prime facie case, a subsequent appeal on that issue concerns an issue of law and is therefore reviewed on a de novo basis. Now, Mr. McClintock will submit to you that Judge Gowdy engaged in some analysis of the evidence, his brief quotes, segments of the court's opinion that was announced from the bench at the time of the ruling. I submit to you that Section 1110 contemplates some analysis of the evidence, and that analysis does not change the fact that Judge Gowdy also said probably a half a dozen times that he was determining that the plaintiff had failed to make out a prime facie case. So we don't have to infer, we don't have to speculate about what Judge Gowdy was doing. In order to accept Mr. McClintock's view of this issue, namely that this is a manifest weight of the evidence matter, you have to ignore Judge Gowdy's repeated assertion that he was finding that the plaintiff failed to make a prime facie case. Or, in the alternative, you must conclude that Judge Gowdy simply did not know what he was doing. Now, in any event, I submit to you that the standard of review here isn't really dispositive. Because when you get to the substance of the case, Judge Gowdy did err. Because what Judge Gowdy did was Judge Gowdy rewrote the contract for the parties. Notwithstanding the fact that he said, again, repeatedly, that he was not severing the subject language out of the contract, that's what he did. Because there is no way to get where he got without ignoring that language. And in the course of doing that, he rewrote the party's contract. What's interesting to me is that, and I think it amplifies the error that he made, when he ruled, he restored the parties back to the position they were in under the original lease. The troubling aspect of that is the parties had been three years into this five-year lease, and they had ignored the original lease after year one. In fact, the rent that was paid was increased by 20% in year two, and by 38% in year three. What's the 38% increase in year three, an increase on the original rent? Over the amount of the original rent, yes ma'am. It was not an increase on the second year of the lease. That increase represented 14% over year two. So the parties were still dealing with the original $96,000 rent, even in the third year. No, in the third year, they added $36,000 to that. But they were adding it not to the second year increase. They were still dealing with the original $96,000 rent. I would say that they were using that as a baseline, and then the amount of increase, the 38% is in relation to the original. My point being that the original rental agreement had become economically irrelevant by year three, in light of the economic volatility that motivated the parties to do what they were doing in the first place. And so what Judge Galley did, Judge Galley did what Professor Corbin admonishes courts not to do. And Judge Galley imposed his own conception of what the party should or might have undertaken, rather than confining himself to the implementation of a bargain to which they have mutually committed themselves. Thus, he goes on to define, definiteness as to material terms is the very essence of contract law. What we have here is these parties bootstrapped themselves into a relationship that legally doesn't exist anymore. And I think that what the court should have done was left them in that position, rather than to pick one side or the other. He didn't. Thank you. Any questions? Well, yeah. If I go into a restaurant and I like this restaurant, and so I order whatever the food is, and I like it as well, so I give the waitress a 50% tip, because I like this table, and I want to come back, and I want to get this kind of service and whatever. And the next time I give her a 50% tip, over and above what I've agreed to pay by contracting, you know, the food says it's $50 or whatever, and that's what I agree to pay when I go into a restaurant and order that food. The third time I come in, am I bound to give her a 50, you know, and I get the same service and all that stuff? And am I somehow contractually bound to give her a 50% tip? I think the defect in your analogy is the tip is obviously gratuitous. Let me change your example a little bit. Let's say the menu says that the hamburger you get, we'll talk about what we're gonna charge you for the hamburger, based upon the price we have to pay for beef, and all of that sort of thing, and what we have to pay our health. You order that hamburger, last week it cost you $3. They bring you a bill for six. And you're outraged. Why should I do that? Well, it said there that we're gonna talk about this. Well, at that point, what do you have? Do you have a contractual relationship with the restaurant or not? I'm saying that when you add language that has no standard, no index, that you lose all frame of reference to definiteness, and that's where they are. Well, what was the consideration for this amendment? Each party got what they bargained for. What? I'm sorry? What was that? Mr. Foote, the tenant, indicated that his motive for starting this discussion was to cement, that's the word he used, cement his relationship with the landlord. Five years of a relationship cemented already. Okay. But that- What does he get from that? I'm just saying that's what he said. The reason was he got what he bargained for, and that's proper consideration. Now, procedurally, since you've raised this issue, Mr. McClintock mentioned that also as an affirmative defense. Now, keep in mind, we are here procedurally on the court's granting of a motion for directed finding at the end of the plaintiff's case. We never got to the merits at the trial court level of that issue. I don't think that's procedurally before the court, but I think to answer your question, he got exactly what he bargained for. He had a motive for what he did. I would suggest to the court that this five-year lease represented only a portion of the relationship he'd had with this particular landlord for many years. I think the record says 12 or 15 years. Thank you very much, Mr. Bowman. Mr. McClintock. May it please the court, counsel, good afternoon. Actually, Mr. Bowman and I don't have too much of a disagreement as to the facts of this case. The problem is that the trial court and I disagree with the interpretation of those facts, because we believe that really the protagonists in this case  because prior to the trial, prior to the entry or the arrival of the farm manager, there was somewhat of a longstanding relationship between the farmer and the landowner. At some point, the landowner, and this was a very informal relationship that they had. The landowner decides that he needs a farm manager. The farm manager comes in. He's a non-lawyer, but he does negotiate and drafts his own leases. So what he decides to do is he decides to draft a five-year lease, and he decides to have it executed one and a half years before it's even begin. So we're now like six and a half years out, and there's some other unusual things about this lease. For instance, one of the things is that the landlord is going to pay for the fertilizer, which is a very unusual relationship. Sometimes they split it, but it does affect other terms of the lease, including the cash rent. So if you are the farmer, the tenant farmer, and the landlord says, I'm gonna pay for all the fertilizer or most of the fertilizer, I guess I'm gonna pay more cash rent because that's an expense that I do not have to absorb. Well, guess what? Comes out of trial that the farm manager is paid a percentage of the cash rent. So it's to his financial advantage to be negotiating these types of contracts where he makes certain concessions to the tenant farmer, that drives up the cash rent, he gets a certain percentage of that. He acknowledged at trial that that was most unusual. I think long-term leases are kind of unusual too in the business. Anytime you have a long-term lease, there are risks involved in that because things change. There's risks for the tenant and there's risks for the landlord. Well, over this particular period, it turned out to be a disastrous lease for the landlord because during this particular period of time, the commodity prices doubled. The corn went from like $2.50 a bushel to $5 a bushel. So it's a boondoggle for the tenant, but the fertilizer costs just skyrocketed, tripled during this period of time. So it turned out to be a disastrous deal that the farm manager had negotiated for his principal. And the other unusual thing in this case is, so we get into this very bad deal. The tenant who was under no obligation other than to live up to the terms, he actually goes to the landlord and says, this has been such a great year for me, such a bad year for you. I'm actually going to volunteer to pay you more money than I have to legally. And everybody acknowledges he didn't have to pay him any more money, but he did. In fact, the other unusual aspect is he said, I'll give you an extra $24,000. And the landlord says, no, that's too much. I'll take 20. So they agree that he's under no legal obligation to do though. So they set up a syringe for this one particular year. In year three, the situation has continued to deteriorate for the landlord and it continues to improve for the farmer. So realizing that he's got his principal into a bad deal, the farm manager, non-lawyer decides that he's going to draft an amendment to the contract. And in response to your question, you said, did he draft a one-year lease? No, he didn't draft a one-year lease. Actually, what he did was he drafted an amendment to the five-year lease. And that did adjust by agreement to rent. And then he added that language, each year we're going to adjust this, okay? So that's actually the second amendment to the five-year lease. At trial, the testimony of the farm manager, when he was on the stand, I asked him, what benefit did the, since he was locked in for several more years through 2010, you know, what did he get? What did the landlord, or what did the farmer get for that? Well, once they get the farmer to sign this document that has this language in there that's very nebulous as to what the rent's going to be, once they have that signed, what do they do? They go out and they file suit in chancery court saying that the contract is void, that this amendment that they drew violated and voided out the five-year contract. And they file suit in chancery, asking for equity. The testimony was taken, exhibits were admitted, and contrary to counsel's assertion, there was evidence introduced about the lack of consideration. There was evidence about the lack of clean hands coming into equity court and other affirmative defenses. So the court did hear that evidence and the court did consider that. And he did enter judgment. Now, although the court did mention prima facie case in passing, he mentioned several other things. And we'll get to that because that, again, it's important on the standard of review question. Because the case is clear, the standard is clear, that if the court actually considered the evidence and ruled on the merits at the close of the plaintiff's case, then the standard is against the manifest weight of the evidence. If he doesn't consider the evidence, but merely finds that the plaintiff failed to prove at least one part of the essential elements of his cause of action, then that is de novo. And so I would suggest to counsel, I would invite counsel to tell you which part of his prima facie case he did not introduce one scintilla of evidence. Because I don't think there is. Because when the court, when you look at the court's ruling, the court says, and I'm quoting, the court construes, the court reasonably concludes, the court finds, the court takes notice of, the court's interpretation, the testimony demonstrated. It's the court's opinion and finding. He uses that language to talk about the evidence in the case and why he's ruling. He's clearly balancing, he's weighing the evidence and balancing in his judgment, passing even on the credibility of the witnesses. Now, with regard to the affirmative defense of lack of consideration, again, that was raised, that was plugged, that was raised, testimony was introduced. The point being that the amendment provided no benefit. The fire manager said, again, it cemented good relations or something, and I would submit to you that good relations is not valid consideration because he had a valid lease with many, several years left remaining. The other point I want to mention that was mentioned at the trial court was the whole idea about the unclean hands thing. The parties have a valid contract. One of the parties realizes it's a bad deal for him or her. So what do they do? They draft another instrument. In my opinion, they draft a void instrument. Then they file suit in equity. They come into the equity court, and then they want to capitalize on their own draftsmanship to say, you know, the whole, you know, you have to throw the baby out with the bathwater because the amendment invalidates the valid five-year lease. Everybody agrees that the five-year lease is a valid lease. But they create the condition, and then they come into court, in an equity court, and they want to benefit by their own draftsmanship. And we would submit that you really can't do that. You shouldn't be able to benefit from that. Our position at the trial, our position again today, and I think it's the position of the trial court, is that the five-year contract is not invalid. What's invalid is the second amendment, the second amendment to that. And it's invalid because that is indefinite, and it's void for indefiniteness, which is one of the essential terms of a contract. There has to be definiteness, particularly with regard to the rent that's going to be paid. And so I think that my whole argument can be summarized basically by saying, how can an invalid instrument invalidate a valid instrument? It's the amendment which is void on its face. And that's what the trial court ruled. The trial court, in its opinion, said, that amendment is surplusage, it's meaningless, we're going back to the five-year contract, and it should be disregarded. So for all of those reasons, the trial court considered the evidence throughout the amendment and said, folks, we're bound by the five-year contract. There's still several years left to run. In fact, that's still valid. We're still operating under that five-year contract. Is this the fifth year? This summer? No, this wouldn't be, yes. This crop year, if we plant this crop year, this would be the last year of the lease. I'd be happy to answer any questions you would have. I just want, can you void a farm contract or stop it in March without notice, like back in the fall or something? No, I think you have to give notice of your intention, not to, not to. Okay, thank you. Thank you very much, Mr. McClintock and Mr. Boland. Well, I tend to try and address things head-on. And the challenge to this court is, what are you gonna do with the subject language? You're either gonna enforce it or you're going to ignore it. Now, contrary to what Mr. McClintock just said, because Judge Galley was asked specifically by me at the trial, and the record will reflect this, are you, Judge Galley, severing the language, the subject language, from the trial? From the contract? And the answer was no. He repeatedly said he wasn't doing that. He has no authority to do that. Which language are you talking about? Are you talking about that each year the cash rental amount shall be, what's that mean? That means that each year they're supposed to renegotiate how much rent is to be paid. The troubling aspect, the aspect that makes it. What if you can't negotiate? What if you can't agree? And that happened in September of 08. You have no contract. You have an essential term which is left unstated, and there is no standard or index incorporated to help anyone determine how you do that. So it's not valid. So I submit to the court that the parties, again, I used the term bootstrap a little bit ago, they bootstrapped themselves into an invalid contract. Now, what Mr. McClintock advocates and what the court did was, even though he said he wasn't severing the language, he did. Even though he has no authority to sever it, he did. And then what did he do? Did he leave the parties with the rental that was the most relevant economically? No. He picked a rental amount that was the least relevant economically. A rental amount the parties had abandoned two years before. I would say that's no more appropriate than picking the last number. But again, contrary to what Professor Corbin counsels us to do, the court, instead of invalidating the contract and saying, I'm sorry, you have no contract relationship, there is no landlord-tenant relationship here, he said, oh, yes, you do. You have one. And I'm going to tell you how much the tenant's going to pay. We're going to go back, even though you folks abandoned that two years ago, we're going back to that number. Well, did you write a new lease, or did you amend the old one? I'm sorry? Was there a new lease written, or was the old one, there was an amendment to the lease? There was an amendment to the lease, which Well, how was that abandoning the original lease? As to the rent, it did exactly that. The original lease called for $96,000 each year over a five-year period. Year one, they did that. Year two, they added $20,000 to that. Year two, they added $36,000, almost $37,000. So two years into it, that $96,000 is wholly irrelevant for the very reasons that we've noted, both Mr. McClintock and I. A record spike in prices, record spike in input costs. It doesn't make any economic sense to go back to year one. The lease didn't make economic sense, as it turned out. I mean, that's why people contract for a long time. If it had gone the other way. It could have. So your client's farm manager got him in a jam. As it turned out. And if the economy would have turned the other way, and corn prices would have dropped, then it would have been your client who had cut a fat hog. Correct. And these are risks we take when we contract. I understand that. And I'm prepared to have my client live with the realities, the economic realities. But the fact is, in December of 07, looking forward to the year beginning 08, they added language. Each year, the rent shall be adjusted, et cetera, et cetera. Each year. They tried to do that September of 08, they failed. Even though the tenant walked away, having come up with the numbers, and then were to sign a lease that incorporated those numbers at the end of the day. You agreed that it was invalid. I believe that the- Invalid. So it looks to me like the only thing that the trial judge did was look and say, OK, we've got this, and this, and this. And here's the only valid lease I've got before me. And it's for five years, and I'm enforcing it. I don't think it makes any sense legally to make a distinction because the rent was amended in an amendment. We're getting all hung up on that. That's not legally significant. They had a rental amount fixed. They decided to adjust it every year without an index, without a formula, and it left them nowhere. Let me ask you this. I didn't mean to cut you off. What were the primitive elements of your cause of action? Well, it was a declaratory judgment action. So you established the existence of the contract. We were arguing that the Second Amendment to the lease constituted a fatally indefinite, vague component, and therefore the parties had no contractual relationship at all. And if there was no consideration for that amendment, does it drive the whole lease out of existence? You're asking me to assume that there was no consideration. Assumption there was no consideration. Does that invalidate the amendment or the lease? I suppose it would invalidate the amendment. But this was an executed agreement by that time that the additional rental had been paid. And notwithstanding the fact that Mr. McClintock asked on a cross-examination some things about, like you did, would the tenant have been obligated and that sort of thing, that doesn't address the consideration issue. We didn't get to that procedurally. So I submit to the court that the trial court erred because the trial court inevitably had to choose when the trial court didn't simply leave the parties where they were with an invalid agreement. The trial court had to choose, and that was a mistake. It would have been a mistake to pick us. And for that reason, we asked the court to reverse and render in favor of the plans. Thank you, Mr. Fong. And thank you both for your argument today. We will take this matter under consideration and get back to you with a written decision within a short time.